*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

QUALITY CUSTODIAL RESIDENTIAL AND
COMMERCIAL CLEANING SERVICE, LLC,

        Plaintiff/Counterdefendant-Appellant,

v

BEECHER COMMUNITY SCHOOL DISTRICT,

        Defendant/Counterplaintiff-Appellee

UNPUBLISHED
September 16, 2025
2:05 PM

No. 370621
Genesee Circuit Court
LC No. 22-117551-CB

Before: WALLACE, P.J., and RIORDAN and REDFORD, JJ.

PER CURIAM.

In this action involving a fixed-fee agreement for custodial and maintenance services, plaintiff appeals by right the trial court's order granting summary disposition in favor of defendant and dismissing plaintiff's claims of breach of contract, promissory estoppel, and unjust enrichment under MCR 2.116(C)(10) (no genuine issue of material fact).[1] We affirm.

## I. FACTUAL BACKGROUND

In July 2019, defendant issued a request for proposals (RFP) for custodial and maintenance services for its multitude of buildings and sites used by approximately 762 students and staff. The RFP included a description of the services sought, which indicated that the successful bidder would "furnish all management, supervision, supplies, equipment, services, and necessary insurances required to provide all School District custodial services and School District maintenance and repair services in accordance with this RFP." To meet these ends, the RFP required the successful bidder, *inter alia*, to hire and train its own staff and management team, communicate regularly with defendant, and continually analyze defendant's custodial and maintenance repair operations.

---

[1] Defendant also brought a counterclaim, which is not at issue in this appeal.

-1-

The RFP also delineated defendant's operational requirements, indicating that the successful bidder

> shall provide all custodial/maintenance/repair services necessary to meet the School District's *regular needs as described by the School District*. Service shall be provided on all school days, throughout the summer and on breaks as needed, or as otherwise designed [sic: designated] by the School District. If necessary to meet performance obligations and standards, cleaning may occur on weekends.
>
> *. . . As requested by the School District, the Proposer shall provide other custodial/maintenance/repair services when such services do not conflict with regular service obligations*. [Emphasis added.]

Regarding the mandatory provision of services, the RFP did not exclusively define the term "services." Instead, the RFP included a "non-exclusive list" of services in its Attachment E.

This 10-page, single-spaced non-exclusive list of custodial and maintenance services set forth the "minimum acceptable standard for the activities" to be performed, and began with the following statement: "**It is acknowledged that the School District's services may be further described and that the Proposer is expected to perform any reasonably modified list of services.**"

Plaintiff—at the time a residential custodial cleaning company that had not had any contracts for commercial cleaning—submitted a proposal, which eventually culminated in an agreement between the parties, termed the "Custodial and Maintenance Services Agreement" (Agreement), that is the subject of this dispute.

The Agreement expressly incorporated by reference the RFP and the accepted portions of plaintiff's proposal. Plaintiff agreed to provide "all services identified in Attachment E ('Non-Exclusive List of Services') of the School District's RFP." Notably, the Agreement included an integration clause: "This Agreement, together with its attachments, constitutes the entire agreement between the Parties, supersedes all previous agreements, written or oral, and there are no understandings, representations or warranties of any kind, express, implied, or otherwise, not expressly set forth in this Agreement." The initial term of the Agreement spanned from September 2019 through June 2021. Mr. Wantwaz Davis, plaintiff's owner, and Dr. Marcus Davenport, defendant's then superintendent, signed the Agreement.[2]

Six months after plaintiff commenced performance under the Agreement, the COVID-19 pandemic began. As a consequence, defendant shut down its operations in March 2020. Ten months later, in January 2021, students and staff were permitted to return to campus on a limited

---

[2] Both parties agree that Davenport was authorized to sign the contract pursuant to a vote by the Board of Education.

basis, with only a quarter of the elementary-school building and a one-fifth of the high-school building being accessible.

Upon re-opening portions of the schools, defendant informed plaintiff which spaces were in use and would need cleaning, held biweekly meetings with plaintiff to walk through the building,[3] and supplied plaintiff with foggers and fogger fluid for COVID-19 cleaning. In e-mail communications from in or about January 2021, Davenport asked plaintiff to devise a plan to ensure the safety of students and staff in light of COVID-19, which involved tasks such as daily mopping, cleaning, and sanitation measures, including fogging between rotations of students.[4] Two more e-mails from Davenport to plaintiff, in February 2021, thanked plaintiff for its efforts, recognized that "[t]he reality of COVID-19 has changed how [defendant] must operate to maintain safety from a physical aspect," and that all involved parties "have to consider some extreme changes to [defendant's] current protocols and ability to strictly limit crowds at events," and

---

[3] It appears from the context that these "biweekly meetings" were held twice a week, not once every two weeks.

[4] Davenport's e-mail itemized seven tasks:

> 1. Please create a schedule to have a staff person present whenever students are in the buildings each day for academics and athletics due to the concerns with COVID-19 prevention. . . .
>
> 2. Please make sure the gym at the high school is completely sanitized and wet mopped to provide the safest playing surface for our students. This must be done nighty [sic] due to COVID-19.
>
> 3. Please have someone available to fog and sanitize in between all rotations of students and athletes in our face to face program. This must be done daily due to COVID-19.
>
> 4. Please have someone complete stripping and waxing the back hallways at the high school near rooms 43, 44, 45, etc. This area must be completed ever [sic] though it is a low traffic area.
>
> 5. Please disinfect and sanitize the wrestling room for our Wrestling Coach daily. This must be done each day due to COVID-19. The wrestling mat should be treated like the gym floor daily.
>
> 6. Please remove any and all unused equipment from the hallways and keep them out of the hallways at all times since we have a return of students in both buildings. Also, please make sure to keep all janitor closets neat and secure since students are back in buildings.
>
> 7. Please provide a legitimate fogging/disinfecting schedule for all buildings and especially the high traffic areas of our district including Central Office.

emphasized that all involved parties should be "on the same page" to meet updated COVID-19 athletic protocols.[5]

Davis testified that he did not realize he had underbid the contract until the COVID-19 pandemic began. He indicated that most of the money defendant paid plaintiff was used for additional supplies and equipment, and to pay plaintiff's workers for their additional labor. In March 2021, Davis sent an e-mail directed to the school board requesting renegotiation of the Agreement. Davis asserted that the COVID-19 pandemic required plaintiff to provide cleaning services beyond the "general and routine" cleaning the Agreement required, and that plaintiff should be compensated for those additional services related to fogging, disinfecting, and sanitizing all surfaces. Davis followed up with two more e-mails to the school board in May 2021, again asserting that plaintiff had not been compensated for the additional COVID-19 services and requesting such compensation. The Agreement, however, was never modified to provide for additional compensation despite Davenport's allegedly having said to Davis that plaintiff would be "taken care of."

Defendant did not rehire plaintiff after the Agreement ended. In July 2022, plaintiff filed a complaint asserting claims of breach of contract, promissory estoppel, and unjust enrichment.[6] With respect to its breach-of-contract claim, plaintiff alleged that defendant promised, but failed to provide, additional compensation for the COVID-19 cleaning protocols that defendant requested and plaintiff agreed to perform. Plaintiff pointed to Paragraph 5B of the Agreement, which required defendant's written approval before plaintiff undertook services outside the Agreement's scope, and to multiple e-mails between the parties regarding the alleged additional services.[7] Plaintiff's claim of promissory estoppel alleged that plaintiff continuously performed the "Covid Cleaning Procedures," which it alleged were outside the scope of the agreement, and defendant promised that it would compensate plaintiff for those additional services. For its unjust enrichment claim, plaintiff asserted that defendant had received additional cleaning services from plaintiff, and that it would be inequitable to permit defendant to retain that benefit without compensating plaintiff.

Defendant eventually moved for summary disposition as to these three counts under MCR 2.116(C)(8) and (10). Regarding the breach-of-contract claim, defendant argued that the alleged uncompensated services fell within the scope of the Agreement, that defendant did not promise

---

[5] Ultimately, defendant was not satisfied with plaintiff's performance of its obligations and chose to use its federal Elementary and Secondary School Emergency Relief funding to hire A&J Custodial for supplemental COVID-19 cleaning. With A&J Custodial supplementing its services for COVID-19 cleaning, plaintiff was tasked with cleaning from 7:30 a.m. through 3:30 p.m., after which A&J Custodial undertook COVID-19 cleaning.

[6] Plaintiff also alleged fraud, but that count was dismissed by the trial court, pursuant to defendant's first motion for summary disposition, and defendant has not raised that issue in this appeal.

[7] Paragraph 5B pertained to "Additional Charges," and provided, "Before rendering any services outside the scope of the custodial and maintenance services, the Contractor must receive prior written approval from the School District's Superintendent of Schools."

-4-

plaintiff additional compensation related to COVID-19 cleaning protocols, and that the Agreement had never been modified. As to promissory estoppel and unjust enrichment, defendant argued that those claims were barred by the Agreement's integration clause, and that unjust enrichment does not lie when an existing contract covers the same subject.

Plaintiff countered that summary disposition should be denied because a question of fact existed whether plaintiff should be compensated for additional services. Plaintiff argued that because the Agreement contained a clause stating that services outside of the Agreement required written approval, the emails and actions of the parties, including requests by defendant for additional services that defendant agreed to perform, effectively amended the Agreement, resulting in an enforceable promise of compensation. As to the unjust enrichment claim, plaintiff added that no contract existed regarding additional COVID-19 protocols.[8] Plaintiff concluded by arguing that defendant violated the agreements mediation clause by seeking summary disposition, in order to avoid further participation in mediation.[9]

Ultimately, the trial court granted summary disposition in favor of defendant under MCR 2.116(C)(10). The court first rejected plaintiff's argument that defendant had modified the Agreement by allegedly acting contrary to the requirement that defendant consent in writing before plaintiff could perform compensable services outside the contract. The court reasoned that "whether Plaintiff had written permission to perform 'COVID' cleaning tasks that it performed does not settle the question of whether those tasks were within the scope of the contract . . . much less the question of whether Defendant agreed to a modification of it." The trial court then rejected plaintiff's claim that the Agreement had been modified when Davenport represented to plaintiff that it would be "taken care of," reasoning that Davenport was not a contracting party authorized to bind defendant. Relatedly, addressing plaintiff's promissory estoppel claim, the trial court determined that there was no genuine issue of material fact that plaintiff could not have reasonably relied on Davenport's alleged promise because plaintiff knew Davenport lacked authority to renegotiate the contract. Turning to plaintiff's unjust enrichment claim, the trial court determined that no genuine issue of material fact existed that the Agreement covered the same subject matter as the uncompensated services allegedly rendered. Consequently, the trial court dismissed all of plaintiff's claims for failure to establish a genuine issue of material fact.

## II. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. See *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). A motion under MCR 2.116(C)(10) is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109,

---

[8] The brief submitted by plaintiff in the trial court does not contain a section explicitly addressing its promissory estoppel claim, but it does generally allege that defendant promised to compensate defendant for additional services, but then failed to compensate plaintiff after those services were formed.

[9] Plaintiff did not address promissory estoppel in its response to defendant's motion for summary disposition.

120; 597 NW2d 817 (1999). In reviewing a motion under MCR 2.116(C)(10), this Court considers all the documentary evidence submitted by the parties in the light most favorable to the nonmoving party. *Bakeman v Citizens Ins Co*, 344 Mich App 66, 73; 998 NW2d 743 (2022). "A genuine issue of material fact exists when the record presents an issue of fact over which reasonable minds may differ." *Id*. It is incumbent upon the adverse party to demonstrate "specific facts[, beyond mere allegations or denials,] showing that there is a genuine issue for trial." *Maiden*, 461 Mich at 120, quoting MCR 2.116(G)(4).

Questions of contract interpretation are also reviewed de novo. *Vanalstine v Land O'Lakes Purina Feeds, LLC*, 326 Mich App 641, 648; 929 NW2d 789 (2018).

## III. BREACH OF CONTRACT

Plaintiff contends that the trial court erred by finding no question of material fact as to whether the parties modified the Agreement. Plaintiff argues that the parties' actions and e-mails relating to COVID-19 cleaning contemplated services that were not part of the original Agreement, and that defendant's having sought these services without written approval from plaintiff, contrary to a provision of the Agreement, showed that the Agreement had in fact been modified. In other words, plaintiff posits that an enforceable modified agreement existed under which it was entitled to additional compensation, which defendant failed to pay. We disagree.

Our "main goal in interpreting a contract is to honor the parties' intent." *Davis v LaFontaine Motors, Inc*, 271 Mich App 68, 73; 719 NW2d 890 (2006). "Courts must discern the parties' intent from the words used in the contract and must enforce an unambiguous contract according to its plain terms." *Id*. Whether contract language is ambiguous is a question of law that this Court reviews de novo. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 463; 663 NW2d 447 (2003).

At the outset, the problem with plaintiff's argument is that it presumes that the COVID-19 cleaning services were outside the scope of the original Agreement, such that modification was necessary in the first instance. In other words, plaintiff's entire argument is predicated on the assertion that it was not contractually obligated to provide cleaning services related to COVID-19. The Agreement's plain terms, however, belie this assertion.

Under the Agreement, the services plaintiff was bound to perform related to an extraordinarily broad range of custodial, maintenance, and repair operations that defendant was contractually permitted to set forth and reasonably modify at its discretion. As noted, the RFP, as expressly incorporated into the Agreement, required plaintiff to provide "all custodial, maintenance, and repair services necessary to meet [defendant's] *regular needs as described by the School District*," and also to provide other services outside plaintiff's "regular service obligations" so long as those custodial, maintenance, and repair services did not conflict with regular services. (Emphasis added). Additionally, Attachment E provided a 10-page nonexhaustive list of the "minimum acceptable standard for the activities" to be performed and included an acknowledgment that services required of plaintiff "**may be further described and that** [plaintiff] **is expected to perform any reasonably modified list of services.**" That list of services included "disinfection" of certain areas, consistent with plaintiff's obligation to provide a

"training program" compliant with "local, state and federally mandated training" for, *inter alia*, "infection control."

With the onset of the pandemic, defendant's regular needs included daily disinfection for COVID-19. As noted, plaintiff was already contractually obligated to provide, as a minimum standard activity, disinfection measures for infection control consistent with its obligation to provide infection-control training under legally mandated protocols. When defendant sought sanitation of the gym and wrestling room, fogging and sanitation between rotations of students, and the creation of a fogging schedule, defendant was "further describ[ing]" the services to be provided under the circumstances of COVID-19 to meet its "regular needs," as it was contractually allowed to do. Further, given that plaintiff was already expected to disinfect certain areas and provide training programs for sanitation, disinfection measures that arose as a result of a pandemic could not reasonably be characterized as an "unreasonable modification." Indeed, when the plain terms of the Agreement are read as a whole, it is evident that the parties contemplated training for infection control along with the provision of certain minimal disinfection measures, and expected that circumstances could arise under which defendant would be entitled to "reasonably modif[y]" those baseline services, and even require services outside plaintiff's "regular service obligations." Plaintiff has not attempted to explain why the COVID-19 protocols did not fit within the meaning of the regular cleaning services "as described" by defendant, or how such services otherwise constituted an unreasonable modification of the enumerated, nonexclusive, regular services that already included disinfection.

Accordingly, we conclude that the COVID-19 services defendant requested unambiguously fell within the scope of the regular cleaning services as further described, or reasonably modified, by defendant, consistent with the terms of the Agreement. It necessarily follows that construing the unambiguous terms of the Agreement, and considering the undisputed facts in the light most favorable to plaintiff, there was no genuine issue of material fact that plaintiff was contractually obligated to provide the described COVID-19 cleaning services as part of defendant's regular needs, and therefore that defendant did not breach the Agreement by refusing to provide additional compensation for those services.[10]

Relatedly, plaintiff's claim that the Agreement was modified to require payment for

---

[10] Plaintiff argues in its reply brief that defendant failed to counter plaintiff's argument that the Agreement was ambiguous; however, plaintiff never made such an argument in its principal brief. In that brief, plaintiff cited to a case holding that ambiguities in contracts are construed against the drafter, but did not argue that the contract was ambiguous.

COVID-19 protocols is inapt because plaintiff was already contractually obligated to provide those services.[11] Thus, there was also no enforceable modified agreement under which defendant was bound to provide plaintiff additional compensation. Given the foregoing, we conclude that the trial court properly dismissed plaintiff's breach-of-contract claim.

## IV. PROMISSORY ESTOPPEL

Plaintiff argues that genuine issues of material fact existed whether defendant made a promise to plaintiff, and whether plaintiff reasonably relied on that promise when it provided alleged additional cleaning services. We disagree.

"To successfully assert a claim for promissory estoppel, a plaintiff must establish the following elements: (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided." *Bodnar v St John Providence, Inc*, 327 Mich App 203, 226-227; 933 NW2d 363 (2019) (quotation marks and citation omitted). To recover damages on a promissory estoppel theory, the plaintiff's reliance on the promise must be reasonable. *State Bank of Standish v Curry*, 442 Mich 76, 83-84; 500 NW2d 104 (1993). Michigan courts apply the doctrine cautiously, i.e., "only where the facts are unquestionable and the wrong to be prevented undoubted." *Bodnar*, 327 Mich App at 227 (citation and quotation marks omitted).

The only promise that plaintiff alleges in support of this claim is Davenport's alleged statement that plaintiff would be "taken care of." Setting aside whether such a statement is sufficiently definite to constitute a promise, and having viewed the record in the light most favorable to plaintiff, we hold that there was no genuine issue of material fact that reasonable reliance was lacking. Davis admitted that he knew that Davenport could only make suggestions, and that defendant's school board held the ultimate authority to provide plaintiff with any additional compensation. Davis's actions were consistent with this understanding, given that he appeared before defendant's school board multiple times in an effort to secure more funding. Because a reasonable person would not expect compensation on the basis of a promise from one lacking the authority to provide it, there was no question of fact on the issue of whether plaintiff

---

[11] Notwithstanding that the issue of modification is neither dispositive nor even relevant under the present facts, our review of the record confirms that summary disposition on this claim was proper. Plaintiff's owner, Davis, admitted that the Agreement had never been modified. Moreover, to effectively modify a contract, the contracting parties must contract to do so. See *Adell Broadcasting Corp v Apex Media Sales, Inc*, 269 Mich App 6, 11; 708 NW2d 778 (2005). However, there was no such offer and acceptance of mutually agreed-upon terms by the contracting parties because, even assuming Davenport had promised plaintiff more compensation, Davenport was not a contracting party and lacked the authority to bind defendant. See *McLaughlin v Bd of Ed*, 255 Mich 667, 670; 239 NW 374 (1931) ("Boards of education, like other corporate boards, execute their powers at meetings lawfully called and held unless otherwise authorized by statute.").

reasonable relied on the promise alleged to have been made by defendant. The trial court therefore properly disposed of plaintiff's promissory estoppel claim on that basis.

## V. UNJUST ENRICHMENT

Plaintiff contends the trial court erred by dismissing its unjust enrichment claim by concluding that the Agreement covered COVID-19 custodial services, thus precluding the unjust enrichment claim. We disagree.

For a plaintiff to prevail on a claim for unjust enrichment, they must establish "(1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant." *Belle Isle Grill Corp v City of Detroit*, 256 Mich App 463, 478; 666 NW2d 271 (2013). "If this is established, the law will imply a contract in order to prevent unjust enrichment." *Id.* "Even though no contract may exist between two parties, under the equitable doctrine of unjust enrichment, a person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 193; 729 NW2d 898 (2006) (cleaned up). The law will imply a contract, and allow recovery on a quantum meruit basis, in order to "prevent unjust enrichment when one party inequitably receives and retains a benefit from another." *Id.* at 194. A contract will be *not* be implied if there is an express contract between the parties covering the same subject matter. *Belle Isle Grill*, 256 Mich App at 478.

Plaintiff admits that, for purposes of an unjust enrichment claim, a contract will be implied at law only when there is no express contract covering the pertinent subject matter. But plaintiff's theory is that no contract existed covering the COVID-19 cleaning services, given that those services allegedly exceeded the scope of the Agreement. Plaintiff, however, does not explain *how* the COVID-19 cleaning services lay outside the scope of the Agreement. Indeed, despite citing numerous rules applicable to the construction of contracts, noticeably absent from plaintiff's argument on appeal is any analysis of the actual contract language explaining how or why the Agreement's unambiguous provisions did not include COVID-19 custodial services. A party may not simply announce a position on appeal and expect this Court to search for legal support to substantiate it. See *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 406; 651 NW2d 756 (2002).

In any event, proper construction of the contractual language, as already explained, belies plaintiff's claim. Under the plain language of the Agreement, the custodial services provided because of the COVID-19 pandemic were included within the scope of services plaintiff was contractually obligated to provide. Accordingly, the trial court did not err by concluding that an express contract existed regarding the provision of COVID-19 services, such that an implied contract covering the same subject matter would not be proper. See *Morris Pumps*, 273 Mich App at 194. We therefore conclude that the trial court properly dismissed plaintiff's unjust enrichment claim.

## VI. MEDIATION CLAUSE

Plaintiff's final argument is that defendant breached the contract because it did not participate in mediation in good faith and should therefore have been precluded from seeking summary disposition. We disagree.

Paragraph 16 of the Agreement provides as follows:

> The Parties shall negotiate in good faith in an attempt to resolve any dispute that may arise under this Agreement. Disputes that cannot be resolved by negotiation shall be submitted to mediation using a mutually agreed upon mediator. In the absence of an agreement on a mediator, each Party shall select a temporary mediator and those mediators shall jointly select the permanent mediator. If mediation is not successful, the Parties may pursue their remedies as they choose. Nothing in this Agreement shall be deemed to prevent the Parties from agreeing in the future to submit a dispute to arbitration.

Plaintiff's briefing of this issue on appeal consists of a conclusory statement that, even though the parties participated in two mediations (one pre-suit and one during the litigation), both of which were conducted by a retired circuit court judge, defendant's conduct was nonetheless "not that of 'good faith' as required by the terms of this contract." Plaintiff does not actually offer any analysis as to why it believes that defendant acted in bad faith, other than to suggest that a party who has agreed to mediate somehow acts in bad faith when mediation fails to resolve a dispute and that party then moves for summary disposition. Plaintiff cites to no authority for this proposition and we decline to adopt it.

We also note that, while the contract plainly indicates the parties were required to negotiate in good faith *before* mediation, it is silent on as to the issue of whether they are required to negotiate in good faith during the mediation; but more importantly, nowhere does Paragraph 16 indicate that pursuit of remedies through civil litigation was precluded in the event of bad-faith *mediation*.[12]

Thus, even if plaintiff had explained why it believed that defendant failed to mediate this dispute

---

[12] The good-faith requirement of the referenced contractual language required that the parties negotiate in good faith *before* mediation. We do not suggest that a party is free to negotiate in bad faith during a mediation, in cases in which the mediation clause of a contract is silent on the issue of good faith, we simply note that the good faith clause in the subject contract says that disputes that cannot be resolved through good faith negotiation shall be submitted to mediation.

in good faith, despite the fact that defendant attended two mediations, its claim would be unsupported by the contractual language.

Affirmed.

/s/ Randy J. Wallace
/s/ Michael J. Riordan
/s/ James Robert Redford